**UNITED STATES of America**

v.

**AMERICAN CYANAMID COMPANY and Rohm & Haas Company.**

**Civ. A. No. 89–0565 P.**

United States District Court, D. Rhode Island.

March 17, 1992.

---

extension of time to do so. We, therefore, assume that plaintiff does not challenge Cortez'

New Jersey citizenship.

Alex A. Beehler, Steve C. Gold, Environment and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff.

Deming E. Sherman, Edwards & Angell, Providence, R.I., for defendants.

## MEMORANDUM AND ORDER

PETTINE, Senior District Judge.

Once again, the Court visits the Picillo Pig Farm, a hazardous waste site in Coventry, Rhode Island. The United States government, through the Environmental Protection Agency, sued American Cyanamid Company and Rohm & Haas Company for recovery of clean-up ("response") costs under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA). The Court found the defendants liable in *United States v. American Cyanamid Co.*, No. 89–0565P (D.R.I. May 31, 1990); the only remaining issue is the amount of recovery the United States may demand from defendants. The Court finds

the defendants liable for the amount calculated on Table 1.

## I. CASE HISTORY

The Picillo Pig Farm has been the center of at least three separate actions before this Court. Litigation surrounding this hazardous waste site began in 1977, when the problem was first recognized.

> State environmental authorities discovered this chemical wasteland [at Picillo Pig Farm] in 1977 after combustible chemicals caused a dramatic explosion and towering flames to rip through the waste disposal site. After the fire, state investigators discovered large trenches and pits filled with free-flowing, multicolored, pungent liquid wastes; they also excavated approximately 10,000 barrels and containers in varying states of decay containing hazardous chemical wastes.

*Violet v. Picillo*, 648 F.Supp. 1283, 1286 (D.R.I.1986). This Court, in *O'Neil v. Picillo*, 682 F.Supp. 706 (D.R.I.1988), *aff'd*, 883 F.2d 176 (1st Cir.1989), *cert. denied*, 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990), found American Cyanamid and Rohm & Haas jointly and severally liable to the State of Rhode Island.

■ The federal Environmental Protection Agency was not a party to the *O'Neil* litigation. The United States brought the present suit to recover its response costs associated with the clean-up of the Picillo Pig Farm. Based on nonmutual offensive collateral estoppel, the Court granted partial summary judgment to the government regarding defendants' liability on May 31, 1991.[1] *United States v. American Cyanamid Co.*, No. 89–0565P (D.R.I. May 31, 1990).

Liability established, only the issue of the amount of recovery remained. On June 26, 1991, the Court referred this action to Special Master Stephen D. Anderson, Esq., for determination of the factual issues regarding the costs incurred

by the United States in connection with the site. Special Master Anderson submitted his thorough and well-organized Report to the Court on November 13, 1991. Both parties, the United States and the generator defendants, have objected to certain findings of fact made by the Master. According to the Order of this Court dated June 26, 1991, the Court will decide *de novo* any of the Master's factual findings objected to by a party, as well as all questions of law based on the record of proceedings before the Special Master.

This opinion will proceed in three parts. First, the Court will review the general law of CERCLA recovery. Second, the Court will summarize the major aspects of the Special Master's findings. Third, the objections of the polluter defendants and the United States will be addressed. Discussion will be in terms of general categories of recovery; table 1 (at the end of the opinion) will set out the final dollar figures.

## II. CERCLA "SUPERFUND" LAW

### A. CERCLA AUTHORIZES AWARDING RESPONSE COSTS TO THE UNITED STATES GOVERNMENT

Congress enacted CERCLA, 42 U.S.C. §§ 9601–9675 in December 1980 "to initiate and establish a comprehensive response and financing mechanism to abate and control the vast problems associated with abandoned and inactive hazardous waste disposal sites." H.R.Rep. No. 1016(I), 96th Cong., 2d Sess. 22, *reprinted in*, 1980 U.S.Code Cong. & Admin.News 6119, 6125. Congress intended CERCLA to place the financial responsibility for cleanup on those polluters who generated and improperly disposed of hazardous wastes.

In broad terms, CERCLA set up a large federal fund known as the "Superfund." EPA uses Superfund money to clean up hazardous waste site dumps; the money

---

1. "Offensive use of collateral estoppel occurs when a plaintiff seeks to foreclose a defendant from relitigating an issue the defendant previously litigated unsuccessfully in another action against the same or a different party." *United States v. Mendoza*, 464 U.S. 154, 159 n. 4, 104 S.Ct. 568, 571 n. 4, 78 L.Ed.2d 379 (1984). "Nonmutual offensive collateral estoppel" means that the plaintiff in the second suit, here the United States, was not a plaintiff in the first suit and is seeking to invoke collateral estoppel.

spent is then recouped from the original polluters. There are approximately 1,200 identified Superfund sites in the United States, and the number increases by about 100 a year.[2]

■ Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), imposes liability on owners of hazardous waste sites, generators of hazardous waste, and transporters of hazardous waste for costs including:

(A) all costs of removal or remedial action incurred by the United States or a State or an Indian tribe not inconsistent with the national contingency plan;

42 U.S.C. § 9607(a)(4)(A). It is worth reiterating that *all* costs incurred by the government are recoverable under this section. This includes indirect costs and administrative expenses. *United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1500–04 (6th Cir.1989); *United States v. Hardage*, 733 F.Supp. 1424, 1432 (W.D.Okla.1989) [hereinafter *Hardage I* ].

In *United States v. Northeastern Pharm. & Chem. Co.*, 579 F.Supp. 823 (W.D.Mo.1984), *aff'd in part and rev'd in part on other grounds*, 810 F.2d 726 (8th Cir.1986), *cert. denied*, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987) [hereinafter *NEPACCO I* ], the Court interpreted the government's response costs to include:

(a) Investigations, monitoring and testing to identify the extent of danger to the public health or welfare or the environment.

(b) Investigations, monitoring and testing to identify the extent of the release or threatened release of hazardous substances.

(c) Planning and implementation of a response action.

(d) Recovery of the costs associated with the above actions, and to enforce the provisions of CERCLA, including the

costs incurred for the staffs of the EPA and the Department of Justice.

*Id.* at 850.

Initial investigative costs are "clearly authorized" for recovery from parties liable under Section 107(a). *New York v. General Electric Co.*, 592 F.Supp. 291, 298 (N.D.N.Y.1984); *see also Hardage I*, 733 F.Supp. at 1432; *United States v. Conservation Chemical Co.*, 619 F.Supp. 162, 186 (W.D.Mo.1985); *United States v. Wade*, 577 F.Supp. 1326, 1333 n. 4 (E.D.Pa.1983).

Under Section 104(b), courts have held that the United States is entitled to recover its litigation costs from liable parties. *NEPACCO I*, 579 F.Supp. at 851; *United States v. South Carolina Recycling & Disposal, Inc.*, 653 F.Supp. 984, 1009 (D.S.C. 1984), *aff'd in part and vacated in part on other grounds sub nom.*, *United States v. Monsanto Co.*, 858 F.2d 160 (4th Cir. 1988), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989) [hereinafter *SCRDI* ].

## B. THE GOVERNMENT'S PRIMA FACIE CASE

■ The National Contingency Plan ("NCP"), promulgated pursuant to 42 U.S.C. § 9605, outlines procedures for selecting response actions to hazardous substance releases.[3] Certain CERCLA directives refer to the NCP, including the relevant provision for CERCLA cost recovery actions.

During all phases of response, documentation shall be collected and maintained to support all action taken under this plan, and to form the basis for cost recovery. In general, documentation shall be sufficient to provide the source and circumstances of the condition, ... [and]

---

**2.** *Paying for the Past*, The Economist, Feb. 29, 1992, at 80.

**3.** After CERCLA's enactment, EPA first used an existing plan issued pursuant to the Clean Water Act, 33 U.S.C. § 1251 *et seq.* In 1982, EPA issued a new NCP specifically addressing the concerns in CERCLA. The CERCLA-based NCP

was revised in 1985 and 1990. The 1982, 1985, and 1990 NCP's have been codified at 40 C.F.R. Part 300. Hazardous Substance Response provisions are found in Subpart F of the 1982 and 1985 NCP's, 40 C.F.R. §§ 300.61–.71 (1983, 1986) and at Subpart E of the 1990 NCP, 40 C.F.R. §§ 300.400–.440 (1990).

accurate accounting of Federal or private party costs incurred....

40 C.F.R. § 300.69 (1986).

Once the government meets the threshold criteria, the burden of proof shifts to the defendants.

## C. BURDEN OF PROOF IN AREA OF RESPONSE COSTS

Liable defendants must pay *"all* costs ... not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(A) (emphasis added). The NCP establishes detailed procedures for choosing appropriate response actions. "As long as the actions taken by the government were in harmony with the NCP, the costs incurred pursuant to those actions are presumed to be reasonable and therefore are recoverable." *NEPACCO I,* 579 F.Supp. at 851.

■ Defendants bear the burden of proving that the response costs claimed by the United States are inconsistent with the NCP. *United States v. Northeastern Pharm. & Chem. Co.,* 810 F.2d 726, 747 (8th Cir.1986), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987) [hereinafter *NEPACCO II* ]. To establish such inconsistency, defendants must prove that the agency's actions were arbitrary and capricious. *Id.* at 748; *United States v. Monsanto Co.,* No. 86–2862–4A, slip op. at 5 (W.D.Tenn. Aug. 12, 1991) (judicial review limited to the administrative record and then only under the arbitrary and capricious standard).

This language [in CERCLA] requires deference by this court to the judgment of agency professionals. [Defendants], therefor, may not seek to have the court substitute its own judgment for that of the EPA. [Defendants] may only show that the EPA's decision about the method of cleanup was "inconsistent" with the NCP in that the EPA was arbitrary and capricious in the discharge of their duties under the NCP.

*United States v. Ward,* 618 F.Supp. 884, 900 (E.D.N.C.1985).

## III. SPECIAL MASTER'S REPORT AND RECOMMENDATION

Special Master Anderson conducted ten days of evidentiary hearings, received testimony from thirteen witnesses, and took into evidence thousands of pages of documents. *See* Master's Report at 1–10. In his Report, the Master addressed the two crucial issues which form the basis of the parties' objections. First, does the government's documentation of expenses satisfy the NCP standard, and, from an accounting perspective, form an adequate basis for cost recovery from the defendants? Second, should certain costs be disallowed because of a substantive inconsistency with the NCP?

Before deducting settlement costs recovered from other parties with respect to the site, and before assessing prejudgment interest, the government initially claimed $5,817,063.43 for EPA and Department of Justice ("DOJ") expenditures. During the course of the proceedings, the government reduced its claim by $543,882.57. Master's Report at 12–13. The Master recommended the additional disallowance of $276,846.32 based on inadequate documentation. Master's Report at 14.

Defendants urge this Court to reject the Master's Report in its entirety save for the above mentioned disallowances. Concomitantly, the government requests that the Court affirm the Master's Report except for four disallowances:

| | | |
|---|---|---|
| 1. | Arthur D. Little contract | $20–25,000 |
| 2. | Interagency agreement-Coast Guard | $39,475.00 |
| 3. | NUS (contractor) Letter Report | $13,516 + $38.66 |
| 4. | Rhode Island Department of Environmental Management ("RIDEM") Indirect Costs | $23,107.74 + 4315.29 |

All other disallowances recommended by the Special Master have not been objected to by the United States; the Court need not discuss those areas. *See* Table 3.

## IV. OBJECTIONS TO THE MASTER'S REPORT[4]

### A. DEFENDANTS' OBJECTIONS BASED ON ADEQUACY OF DOCUMENTATION

Defendants continue to claim that the documentation maintained by the government in this case is inadequate. The Master, through hours of testimony and thousands of pages of documents, evaluated each area of documentation for adequacy.

After reviewing the Master's Report, the transcripts, and the documentary evidence, this Court accepts all but one of the Master's recommendations as to the adequacy of the documentation for allowed and disallowed expenses. Table 1 and Table 2 set forth the final dollar figures involved.

#### 1. *Direct Payroll Expenses*

■ The Court finds the documentation of the payroll expenses adequate. Additionally, the Court will not second-guess the EPA as to the appropriate number of employees necessary for the cleanup of the site.

#### 2. *Indirect Cost Allocation*

The government claims $447,442.00 in EPA indirect costs. "[O]rdinarily courts should allow recovery of these indirect costs." *United States v. Ottati & Goss, Inc.*, 900 F.2d 429, 444 (1st Cir.1990). The defendants contest the award of indirect costs for the period Fiscal Years 1987 through 1991. The Master's Report explains in detail the methodology used by the EPA. Master's Report at 16–20. The Court accepts these costs as adequately documented.

The EPA first issues indirect rates on a provisional basis. The rates are then reviewed and possibly modified by the Inspector General's office. Transcript before

Special Master at 6:94. Until the rates are audited in this fashion, they are not considered final. Therefore, the government may significantly revise the calculations of indirect costs. Master's Report at 20. If the indirect rates applied by EPA are reduced through review procedures, the Court orders EPA to report this fact and to show cause why it should not be required to reimburse the defendants any excess paid under provisional rates.

#### 3. *Journal Vouchers*

A journal voucher is an accounting device which redistributes costs from one account to another. Several specific journal vouchers have been scrutinized by both sides and the Master.

#### a. Journal vouchers for error correction

The Master addressed two journal vouchers for error correction: the Techlaw voucher and the GCA Technology voucher. Master's Report at 24. The Master allowed the former, but disallowed the latter based on adequacy of documentation. Master's Report at 24–27. The Court agrees with the Master's recommendations.

#### b. Journal vouchers for redistribution

Before October 1, 1985, EPA did not have a policy requiring its contractors to bill on a site-specific basis. Contractors, who perhaps worked on multiple sites, were paid by EPA from a general account. However, to recover from specific generator defendants, EPA must properly allocate specific work to specific sites. In seeking to recover costs on a site-specific basis, EPA has used journal vouchers to redistribute to specific sites costs initially billed and paid from a generic account. Six contracts in the case involved this sort of redistribution. The EPA voluntarily withdrew four of the six claims. The Master found the remaining two claims adequately supported by documents and testimony. Master's Report at 31–33. The Court agrees with this recommendation.

---

4. Due to its length, the Special Master's Report  has not been included for publication.

### 4. Multi–Site Contracts with Site–Specific Charges

After October 1, 1985, EPA policy required its Superfund contractors to submit site-specific charges. Defendants challenged fourteen contracts with site-specific charges. Master's Report at 34. In accordance with the Master's findings, the Court holds that these charges were adequately documented by the government. *See* Master's Report at 36–38.

### 5. Letter Reports

■ The EPA documented the services of two national contractors through "letter reports." A letter report comes from the contractor and identifies site-specific charges. The Master allowed the charges under the VIAR (contractor) letter report, but disallowed charges under the NUS letter report. Master's Report at 39–43. The NUS letter report, allocating community relation and file review services to the Picillo site, contained several glaring documentary problems. "It has not been reconciled by EPA; it has not been entered into EPA's accounting system; there is no statement of reasonableness from the project officer (which would be required had a journal voucher been processed for this transaction); the letter report was submitted 3½ years after the services were performed; and the letter report has been liberally redacted." Master's Report at 43. The Court adopts the reasoning of the Master and disallows the NUS charges. Additionally, the amount of $38.66, the NUS fee for simply preparing the letter report, is disallowed.

### 6. Interagency Agreements

■ The Coast Guard expended a reported $469,475.00 in removing hazardous waste drums from the site. Master's Report at 44. The Special Master recommended allowance of all but $39,475.00. Master's Report at 46. Mr. Paul Groulx, the government's on-scene representative during this stage of the clean-up, testified that he personally recommended payment of approximately $430,000. He also testified that subsequent adjustments to the billing were not uncommon. As there is no affirmative evidence in the record contesting the veracity of the Coast Guard's billings, the Court allows the entire amount to be charged to the defendants.

### 7. Cooperative Agreements with the State of Rhode Island

■ The federal government and the State of Rhode Island entered into two cooperative agreements concerning the Picillo site, RIDEM I and II. The Special Master recommended the disallowance of all indirect costs billed under both agreements. Master's Report at 49–52.

■ RIDEM charged EPA indirect overhead expenses calculated as a percentage of its direct payroll costs. Using a rollover system of accounting, [RIDEM] submitted successive proposed indirect overhead allocations to the Department of Commerce ("DOC"). DOC always approved the indirect allocation rate; that rate stayed in effect for one fiscal year. Master's Report at 50. While certain portions of the indirect cost calculations were based on estimates, this fact alone does not preclude recovery. *Hardage II*, 750 F.Supp. at 1503–04. However, the Master considered the accounting problem as a whole and did not base his recommendation solely on the "estimation" factor.

The flaw in the roll-over accounting procedure is demonstrated by the fact that it is impossible to determine whether RIDEM is having a good or a bad year when the rate is 9.21% versus 16%. It could either mean that RIDEM had a large amount of Federal grants and that the costs were spread out among a greater number of projects or that the rate two years prior was incorrect and reduced the current year's rate. The unreliability of this calculation is buttressed by the fact that, for example, in applying the 1985 rate of 15.96%, RIDEM applied it to the salary and fringe benefits incurred during the period July 1, 1984 through July 30, 1985. If RIDEM happened to have a high amount of salary that year, it is applying a high rate to a high amount. If it happened to have a

low amount of salary and fringe during that year, RIDEM is applying a high rate to a low amount.

Although Mr. LaForge testified that RIDEM returns overcharges to the Federal Government two years later by a reduction in the current year rate, Mr. LaForge assumes without apparent basis that RIDEM is applying the current year rate to an equal amount of salary. If the current year rate is not being applied to an equal amount of salary, there is a deviation between what RIDEM returned and what is recouped. The higher the rate, the better it is for Rhode Island.

The difficulties presented by RIDEM's estimate and roll over method are exacerbated by the fact that the United States is seeking to recover those indirect costs for the First Cooperative Agreement over a period of seven years from 1982 through 1989. The rate applied to each fiscal year is based, at least in part, on data from two years prior....

In my judgment, RIDEM's method of indirect cost calculation has not been sufficiently documented or justified. Since I am unable to say that it reasonably relates to the actual direct costs incurred through the ... Cooperative Agreement[s], I must recommend disallowance of all indirect costs ...

Master's Report at 51–52 (citations omitted).

The Court adopts the Master's findings and disallows the indirect charges based on inadequate documentation.

## B. INCONSISTENCY WITH NCP

Once the United States presents its prima facie case for response costs, the burden shifts to the defendants to show that these response costs are inconsistent with the NCP. *Hardage I*, 733 F.Supp. at 1433; *NEPACCO II*, 810 F.2d at 747.

Defendants, like other parties liable under CERCLA, "shall be liable for ... all costs of removal or remedial action incurred by the United States ... not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(A). Consistency with the NCP is "the only criterion for the

recoverability of response costs under CERCLA." *United States v. Kramer*, 757 F.Supp. 397, 436 (D.N.J.1991).

The burden of proving inconsistency with the NCP is on the defendants. *O'Neil v. Picillo*, 682 F.Supp. 706, 728 (D.R.I.1988), *aff'd*, 883 F.2d 176 (1st Cir. 1989), *cert. denied*, 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990). To meet that burden, defendants must identify a particular provision in the NCP with which a specific response action is inconsistent. *See Kramer*, 757 F.Supp. at 436 (striking defenses not linked to NCP provisions); *United States v. Hardage*, 750 F.Supp. 1460, 1499–1507 (W.D.Okla.1990) [hereinafter *Hardage II*] (noting defendants' failure to prove inconsistency with respect to individual response costs); *United States v. Bell Petroleum Servs., Inc.*, 734 F.Supp. 771, 781 (W.D.Tex.1990).

Even if a response action is shown to be inconsistent with the NCP, defendants still have not triumphed. In order to establish the amount of costs to be disallowed, "the defendants have the burden of demonstrating that the clean-up, because of some variance from the Plan, resulted in demonstrable excess costs...." *O'Neil*, 682 F.Supp. at 729.

CERCLA imposes no obligation on the United States to minimize its response costs for the benefit of responsible parties who are liable for the costs. *United States v. Fairchild Ind.*, 766 F.Supp. 405, 411–13 (D.Md.1991); *Kramer*, 757 F.Supp. at 420–21; *United States v. Marisol*, 725 F.Supp. 833, 841 (M.D.Pa.1989). As one court recently noted, " 'all costs' incurred by the United States not inconsistent with the NCP are conclusively presumed to be reasonable, and whether costs are 'necessary' or 'cost-effective' are relevant only to the extent that the NCP imposes those requirements." *United States v. Consolidation Coal Co.*, No. 89–2124, slip op. at 17, 1991 WL 333694 (W.D.Pa. July 5, 1991).

Reasonableness of costs for clean-

up is not a defense to recovery.[5] The requirement of NCP consistency "addresses the nature of the response action for which costs can be recovered," not how much the response action costs. *United States v. Shell Oil Co.*, 605 F.Supp. 1064, 1074 (D.Colo.1985). As long as the actions taken by the government fit within the NCP, the costs are presumed reasonable.

■ Defendants charge that the response costs are not "cost-effective" and are therefore inconsistent with the NCP. This challenge is inapposite.

The NCP outlines two large categories of response actions: relatively short-term removal actions and permanent remedial actions. Removal actions are defined as "the cleanup or removal of released hazardous substances from the environment," and "such actions as may be necessary to monitor, assess and evaluate the release." 42 U.S.C. § 9601(23). Remedial actions include "those actions consistent with permanent remedy taken instead of or in addition to removal actions ... to prevent or minimize the release of hazardous substances." 42 U.S.C. § 9601(24).

Cost effectiveness is a criteria for the EPA *only* when choosing a permanent remedy for a site among competing alternatives. This is the only reference to cost-effectiveness of hazardous substance response actions in the NCP. 40 C.F.R. § 300.68(j) (1983); 40 C.F.R. § 300.68(i) (1985); 40 C.F.R. § 300.430(f)(1)(ii)(d) (1990). The NCP directs EPA to prospectively choose a remedial action that EPA believes will clean-up the site for the least cost. Once EPA validly chooses a permanent remedy for a site, cost-effectiveness is

no longer a viable challenge to the implementation of that remedy.

■ When the United States is required to take response action on its own, responsible parties must accept the government's judgments as to the proper allocation of resources consistent with the government's own procedures and cost controls.[6] "Defendants chose to pay the piper after the dance and, the dance now concluded, they seek to extricate every sour note along the way from the fee." *Bell Petroleum*, 734 F.Supp. at 781.

1. *Defendants' Challenges*

Aside from documentary adequacy, defendants' challenges to the Master's Report primarily center on the cost of the action, not the action itself. The generator defendants appear to challenge all of the allowed costs as inconsistent with the NCP. They claim the work done at the site failed to comply with the technical and "cost-effective" requirements of the NCP. As discussed above, cost-effectiveness is not a proper challenge to a charge under the NCP.

■ Defendants maintain that certain studies failed to address contaminated soils remaining at the site, ignored or mislocated a groundwater divide, failed to implement specific recommendations, failed to develop monitoring data, lacked essential information to evaluate remedial alternatives, and duplicated field work and report preparation. Master's Report at 79–82. However, defendants fail to meet their burden of proof to regarding inconsistency with the NCP. *See O'Neil*, 682 F.Supp. at 728–29. Defendants' claims and challenges are not supported by reference to the ad-

5. In contrast, Congress did impose "reasonable cost" limits on *private parties* seeking to recover response costs. 42 U.S.C. § 9606(b)(2)(D). Congress created a statutory difference between government action and private action. To read "reasonable" into the statute (as defendants advocate) would nullify this congressional differentiation.

6. Defendants complain about the "government's callous attitude towards conservation of scarce financial resources." Defendants' Rebuttal to

the Brief of the United States of America at 24. However, this Court notes that defendants could have taken in upon themselves to clean-up the Picillo Pig Farm; nothing in CERCLA prevents hazardous waste generators from acting instead of the government. Indeed, if defendants had taken this path, they would have controlled costs at the site themselves. Additionally, defendants should be embarrassed, after all the proceeding litigation, to claim that they understand the conservation of financial resources.

ministrative record or through testimony.[7]

Defendants do not adequately prove inconsistency with specific provisions of the NCP. All charges allowed by the Special Master in this section of his Report are adopted by the Court.

### 2. Governmental Challenges

The United States challenges four charge disallowances recommended by the Special Master. Only one challenged disallowance was *not* based on the adequacy of documentation. For those challenges, the question of consistency with the NCP need not be considered. Only $20–25,000 of the Arthur D. Little ("ADL") contract was disallowed because of supposed inconsistency with the NCP.

■ The Court rejects the Special Master's recommendation of the disallowance under the Arthur D. Little contract. ADL has been and continues to conduct studies aimed at selecting and implementing a permanent remedy for the groundwater contamination at the site. The recommended disallowance is based on EPA's rather sudden change of contractors for this investigation.[8] Due to the change in contractors, a certain amount of ADL's work overlapped with previous contractor costs. The Court cannot second-guess the underlying the underlying reason for the change in contractors. However, the overlap does not rise to the level of inconsistency with NCP; the entire cost of ADL's work must be allowed.

### C. DEPARTMENT OF JUSTICE CHARGES

■ In addition to costs incurred by EPA, the United States seeks to recover $70,505.89 for work performed by the United States Department of Justice, Environmental and Natural Resources Division. Defendants challenge this amount based on the method of calculation. The amount charged relates to four litigation matters pertaining to the Picillo site: *United States v. American Cyanamid Co. and Rohm & Haas Co., Inc., United States v. Rutgers, United States v. Capuano*, and *United States v. Ashland Chemical.*

All of these cases relate to the State of Rhode Island's case against numerous defendants over the Picillo Pig Farm. As a matter of law, under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a)(4)(A), the government may recover "all costs of removal or remedial action . . ." related to a particular Superfund site. In similar areas of concern, other courts have applied this provision to recover all litigation and enforcement costs from any and all defendants found jointly and severally liable. *SCRDI*, 653 F.Supp. at 1009 (where most defendants were held liable on summary judgment but one went to trial, all were jointly and severally liable for all enforcement costs, including costs of trial); *Hardage I*, 733 F.Supp. at 1432 (all defendants jointly and severally liable for all litigation costs); *NEPACCO I*, 579 F.Supp. at 851.

The government points out in a footnote:

The Court should note there is no unfairness to requiring these Defendants to bear the litigation costs associated with pursuing a liability judgment or consent decree against other responsible parties. Each CERCLA defendant stands to benefit from the United States' effort to force additional defendants to *share* the costs of cleanup—as these Defendants have benefited by receiving credit against their liability for the amounts recouped in settlements with other parties.

The "should" language is not mandatory language. In this context, "should" is used as permissive and guiding language. In the NCP, the word "shall" appears when actions are meant to be mandatory.

---

**7.** Additionally, defendants err in their "recipe" type interpretation of the NCP. Section 300.-68(e) provides "[i]n determining the appropriate extent of remedial action, the following factors *should* be assessed in determining whether and what type of source control remedial measures *should* be considered . . ." 40 C.F.R. § 300.68(e) (emphasis added). A list of factors follow this provision; defendants maintain these factors were not properly applied.

**8.** EBASCO Services, Inc. had been performing work in this area.

United States Memorandum of Law Following Special Master's Hearing and Objections to Special Master's Report and Proposed Findings of Fact at 25 n. 14. While it would be simple to accept this statement as true, additional thought yields another possible scenario.

In the three actions related to the present one, the DOJ approved settlements totaling $1,681,800.00. Assuming that DOJ operates logically, it is difficult to believe that these settlement amounts do not already include the costs of pursuing such settlements. The Court is troubled by this lack of fundamental fairness. Certainly, defendants will benefit from an offset of their liability by application of settlement amounts already collected. However, the government cannot recover *twice* for the same work. The Court infers that the settling defendants have already borne the DOJ costs for obtaining approval of the consent decrees.

Accordingly, the amounts charged by DOJ to the present defendants shall be reduced by the amount allocable to the other settled cases.

## D. INTEREST

The United States also seeks prejudgment interest on costs incurred by EPA and DOJ. The amount originally asserted by the government is no longer valid, due to amounts withdrawn voluntarily and by this Court. The government will have to recalculate the interest owed based on the final figure presented in this opinion. *See* Table 1.

■ Defendants challenge EPA's method of interest calculation; specifically, they claim Rhode Island law does not allow the interest to be compounded. However, this is not an area in which Rhode Island law controls.

CERCLA specifies that "[t]he rate of interest on the outstanding unpaid balance of the amounts recoverable under this section shall be the same rate as is specified for interest on investments of the Hazardous Substance Superfund...." 42 U.S.C. § 9607(a). The provision ensures that when the government is forced to expend Superfund money on clean-up actions, Superfund will be fully replenished. Under this provision, responsible parties are liable not only for the amounts spent, but also for the lost investment income those amounts would have earned.

The United States is entitled to compounded prejudgment interest, calculated in the manner described in the Master's Report at 74–77. The United States shall submit revised calculations based on the final determinations of costs awarded by this Court.

## V. CONCLUSION

There is much about CERCLA that, at times, is fundamentally unfair to all parties. On the federal government's side, a great deal of money has been spent on clean-up and litigation without any tangible recovery. Active clean-up of the site proceeded from 1979–1982, and fourteen years have elapsed since the site's discovery. Such a lengthy delay hurts the environmental clean-up process as a whole. Superfund money must be repaid in order to continue necessary environmental work at other locations.

■ For defendants involved in hazardous waste sites, CERCLA deals a harsh blow by imposing strict liability. *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1044 (2d Cir.1985). No matter how careful one is about disposing hazardous waste, the liability remains. CERCLA liability is also joint and several. *O'Neil v. Picillo*, 883 F.2d at 179. Therefore, the proportionate amount of waste one is responsible for is rendered immaterial. It is no wonder that defendants, faced with large clean-up costs, litigate matters even when the case against them is clear cut.

However, with all the dollar figures in this section of the case, it is easy to lose sight of the underlying purpose of CERCLA and of this action. The attention of the United States has recently focused on the increased environmental degradation of our land. The EPA, using Superfund money, can immediately begin to clean-up a polluted site. While the present litigation is still

on-going, the active work at the site has been finished for ten years. Not only does quick response save financial resources, but it saves further environmental trauma to land, water, animals, people.

In the future, Congress may act to change CERCLA and related environmental statutes. The policy decisions involved in rewriting such legislation will be important and far-reaching. Until that time, CERCLA remains the avenue of response to hazardous waste sites. Defendants American Cyanamid and Rohm & Haas are liable for the amounts discussed above and listed in Table 1.

SO ORDERED:

TABLE 1

| Expense Category | Expenditures Claimed by EPA | Amounts Withdrawn by EPA | Amounts Withdrawn by Master | Amounts Withdrawn by Court | Final Amount Awarded |
|---|---|---|---|---|---|
| Intramural: | | | | | |
| travel | $8,619.06 | $0.00 | $0.00 | $0.00 | $8,619.06 |
| payroll | $284,687.41 | $0.00 | $0.00 | $0.00 | $284,687.41 |
| indirect | $447,442.00 | $0.00 | $0.00 | $0.00 | $447,442.00 |
| Extramural: | | | | | |
| contractors* | $1,881,451.20 | $531,221.04 | $80,416.72 | $60,416.72 | $1,289,813.44 |
| interagency | $477,117.14 | $0.00 | $39,475.00 | $0.00 | $477,117.14 |
| RIDEM I | $2,624,990.87 | $12,661.53 | $152,639.31 | $152,639.31 | $2,459,690.03 |
| RIDEM II | $22,249.86 | $0.00 | $4,315.29 | $4,315.29 | $17,934.57 |
| DOJ: | $70,505.89 | $0.00 | $0.00 | $34,979.65 | $35,526.24 |
| SUBTOTAL: | $5,817,063.43 | $543,882.57 | $276,846.32 | $252,350.97 | $5,020,829.89 |

SETTLEMENT CREDITS: $1,681,800.00

TOTAL: $3,339,029.89 [plus interest]

*see Table 2 for breakdown

TABLE 2

| Contractor | Amount Claimed | Amount Withdrawn By EPA | Amount Withdrawn By Master | Amount Withdrawn By Court |
|---|---|---|---|---|
| Peabody Clean Ind. | $639,588.48 | | | |
| Kent County Times | $88.50 | | | |
| Coleman Co. | $433.96 | | | |
| Court Reporter | $217.10 | | | |
| Arthur D. Little | $169,547.09 | | $20,000.00 | |
| VIAR | $59,486.04 | | | |
| Roy F. Weston (1) | $565.73 | | | |
| Ecology & Env. (1) | $126,036.12 | $126,036.12 | | |
| NUS (1) | $38.66 | | $38.66 | $38.66 |
| Techlaw* | $6,705.83 | | | |
| Techlaw-REAT* | $9,215.09 | | | |
| Techlaw-CEAT** | $110,799.90 | | | |
| Techlaw-CET | $481.20 | | | |
| GCA Technology** | $103,295.39 | | $46,862.06 | $46,862.06 |
| NUS (2) | $13,516.00 | | $13,516.00 | $13,516.00 |
| EBASCO | $137,046.57 | | | |
| Ecology & Env. (2) | $120,884.73 | $120,884.73 | | |
| Roy F. Weston (2) | $6,542.25 | | | |
| Alliance/GCA | $177,897.03 | $166,569.47 | | |
| Planning Research Corp. | $138,012.09 | $117,730.72 | | |
| Camp, Dresser & McKee | $26,794.78 | | | |
| Alliance | $34,258.67 | | | |
| TOTAL | $1,881,451.21 | $531,221.04 | $80,416.72 | $60,416.72 |

FINAL AMOUNT AWARDED FOR CONTRACTORS: $1,289,813.45

*journal voucher error corrections included
**journal voucher redistribution included

## TABLE 3

### CHARGE DISALLOWANCES RECOMMENDED BY THE SPECIAL MASTER

| | | |
|---|---|---|
| 1. | Arthur D. Little+ | $20–25,000.00 |
| 2. | Coast Guard+ | $39,475.00 |
| 3. | NUS | $13,516.00 + 38.66 |
| 4. | RIDEM indirect costs | $23,107.74 + 4,315.29 |
| 5. | Tighe & Bond Study* | $109,297.00 |
| 6. | GCA Technology* | $11,862.06 |
| 7. | GCA Technology* Journal Voucher* | $35,000.00 |
| 8. | RIDEM I Auto Maintenance* | $20,234.57 |

\*disallowance not challenged by the government
+disallowance rejected by the Court