UNITED STATES of America, Plaintiff,

and

State of Colorado, Intervenor,

v.

BRODERICK INVESTMENT COMPANY, Tom Connolly as Trustee, and Burlington Northern Railroad Company, Defendants.

Civil Action No. 86–Z–369.

United States District Court,
D. Colorado.

Feb. 25, 1997.

Stephen Taylor, Assistant U.S. Attorney, Denver, CO, Jerel L. Ellington, Environment & Natural Resources Division, Denver, CO, Richard L. Sisk, Office of Regional Counsel, U.S. Environmental Protection Agency, Region VIII, Denver, CO, for plaintiff.

Robert Eber, Attorney General's Office, Natural Resources Section, Denver, CO, for intervenor.

Gary E. Parish, Robert J. Potrykus, Jr., LeBoeuf, Lamb, Greene & MacRaie, L.L.P., Denver, CO, for defendant Burlington.

## AMENDED MEMORANDUM OPINION AND ORDER

WEINSHIENK, District Judge.

### I. BACKGROUND:

This matter, before the Court under 28 U.S.C. § 1331, relates to environmental contamination and clean-up at the Broderick Wood Products Company site (Site), a 64 acre parcel located immediately northwest of Denver in Adams County, Colorado. From 1947 to 1981, Broderick Wood Products Company operated a wood treatment facility at the Site. Process wastes were initially disposed in two unlined impoundments in the north-west portion of the Site; starting in 1955, however, waste products were burned off due to extensive seepage just to the north of the property line.

The United States Environmental Protection Agency (EPA) conducted several investigations of the Site, beginning in April, 1981. In 1984, the Site was placed on the National Priorities List for clean-up pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). The United States initiated this case in 1986. At that time, the parties from which the United States sought response costs were the Broderick Investment Company (BIC), which had assumed the assets and liabilities of Broderick Wood Products Company, and the current and former trustees of BIC (collectively, the BIC defendants). In March, 1992, EPA notified Burlington Northern Railroad Company (BN) that it was a potentially responsible party (PRP) and, as such, might be liable for Site clean-up costs. BN was added as defendant to this action four months later.

On December 2, 1993, the Court granted summary judgment finding the BIC defendants liable for all CERCLA response costs incurred by the United States at the Site. A trial as to the liability of BN was held in April, 1994, followed by a separate trial on the divisibility of harm. By Order entered on August 26, 1994, the Court found that there were two plumes of contamination and, accordingly, the harm was divisible. BN was found to be jointly and severally liable for response costs incurred in connection with the northwest section of the Site, and for contamination emanating from that area.

On November 8, 1995, the Court approved a Consent Decree between the United States, the State of Colorado, and the BIC defen-

dants. The sole remaining issue concerns the amount of response costs, if any, recoverable from BN. The United States seeks all response costs incurred in connection with the area for which the Court previously found BN to be liable. Colorado seeks part of the funds it expended in connection with a Superfund State Contract, which requires the state to pay 10 percent of total response costs. BN claims that the actions of the EPA, its clean-up decisions, and selected remedies were arbitrary and capricious and inconsistent with the National Contingency Plan (NCP), and thus not recoverable. BN further claims that the State's claims are derivative and subject to these same defenses. On November 18 and 19, 1996, the Court heard arguments on these issues as well as testimony from each side's expert.

## II. BN'S ASSERTED DEFENSES

### A. Standard Of Review

Section 107(a) of CERCLA provides, "Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section," a PRP "shall be liable for ... all costs of removal or remedial action incurred by the United States government ... not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a). CERCLA defines "removal" as

the cleanup or removal of released hazardous substances from the environment, ... such actions as may be necessary to monitor, assess, and evaluate the release or threat of release ... the disposal of removed material, or taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment.... The term includes, in addition, ... action taken under section 9604(b) of this title.

42 U.S.C. § 9601(23). Generally, section 9604(b) includes investigation, monitoring and other information gathering activities undertaken to characterize the hazardous substances, and activities relating to planning or directing response actions and to the recovery of response costs. *See id.* § 9604(b).

Similarly, CERCLA defines "remedial actions" as

those actions consistent with permanent remedy taken instead of or in addition to removal actions ... to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or to the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement ... cleanup, recycling or reuse, diversion, destruction, ... onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment.

42 U.S.C. § 9601(24).

The parties do not dispute that the United States has incurred response costs; in fact, **the United States and BN have reached a stipulation concerning the costs allocable to that portion of the Site for which BN is jointly and severally liable.** (*See* Pre–Trial Stipulations Of Plaintiff And Defendant, *United States v. Broderick Investment Co.,* No. 86–369 (D.Colo. Oct. 10, 1996)). Accordingly, BN bears the burden of showing that the actions of United States, acting through the EPA, were inconsistent with the National Contingency Plan (NCP).[1] *U.S. v. Hardage,* 982 F.2d 1436, 1442 (10th Cir.1992), *cert. denied,* 510 U.S. 913, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993). To meet this burden, BN must show that "the EPA acted arbitrarily and capriciously in choosing a particular response action to respond to a hazardous waste site." *Id.; see also* 42 U.S.C. § 9613(j)(3).

The United States argues that in addition to demonstrating arbitrary and capricious decision-making, BN must also show that any departure from the NCP resulted in expenditures demonstrably in excess of those that would have been incurred absent such a departure. In support, the United States

---

1. Two different NCPs were in force during the Site remedial activities: the 1985 NCP, which applies to the first Record of Decision for the Site, and the 1990 NCP, which applies to all other activities. Unless otherwise noted, citations refer to the 1990 NCP.

cites *O'Neil v. Picillo,* 682 F.Supp. 706, 729 (D.R.I.1988), *aff'd,* 883 F.2d 176 (1st Cir., 1989), *cert. denied,* 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990). Although in *O'Neil* the district court adopted such a rule, this issue was not before the court of appeals and is not addressed in its opinion. *See* 883 F.2d at 176–183. Moreover, it appears that the *O'Neil* district court is alone in imposing this additional requirement. *See, e.g., Wash. State Dept. Of Transp. v. Natural Gas Co,* 59 F.3d 793, 805 (9th Cir.1995) (disallowing response costs defendant proved to be the result of arbitrary and capricious actions); *In re Bell Petroleum Srvcs., Inc.,* 3 F.3d 889, 907 (5th Cir.1993) (same); *United States v. Princeton Gamma–Tech., Inc.,* 31 F.3d 138, 143–44 (3d Cir.1994) (costs may be disallowed if defendant proves action was arbitrary and capricious). Accordingly, the Court will apply the standard as set forth by the Tenth Circuit in *Hardage,* and disallow any costs that BN proves were incurred due to an arbitrary and capricious choice of response actions, without requiring any additional showing on excess cost. *See United States v. Hardage,* 982 F.2d at 1441–42.

### B. Notification Of Potentially Responsible Party

■ BN asserts that the United States and Colorado should be precluded from recovering any response costs they incurred prior to notifying BN that it was a PRP. EPA began work at the Site in 1982. By the time the Site was placed on the National Priorities List in September, 1984, EPA had notified the BIC defendants of their prospective liability. BN was first informed of its status as a PRP eight years later, on March 31, 1992.

BN argues that although it is liable for all response and removal actions not inconsistent with the NCP, *see* 42 U.S.C. § 9607(a), the United States' failure to notify BN of its liability prior to the incurrence of response costs nonetheless precludes the United States from recovering those costs as damages, in other words, that failure acts as a bar to liability prior to March 31, 1992. According to BN, identification and notification of PRPs is a "response" or "remedial action"

that CERCLA requires EPA to carry out, and the agency's failure to do so was arbitrary and capricious, and inconsistent with the NCP. BN has failed, however, to point to any statutory language or case law to support its proposed definitions. Indeed, the Court has been unable to find any indication that Congress intended for these terms, whose definitions are set out in detail in the statute, *see* 42 U.S.C. §§ 9601(23) and (24), to encompass notification of PRPs. *See also United States v. Hardage,* 733 F.Supp. 1424, 1434 (W.D.Okla.1989), *rev'd other grounds,* 982 F.2d 1436 (10th Cir.1992), *cert. denied,* 510 U.S. 913, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993) (permitting United States to recover response costs incurred prior to notification of PRPs).

CERCLA requires the agency to make "reasonable efforts to identify and notify potentially responsible parties as early as possible before selection of a response action." 42 U.S.C. § 9613(k)(2)(D). That same provision states, "Nothing in this section shall be construed as a defense to liability." *Id.* BN accordingly relies upon EPA guidelines concerning PRP identification and notification to support its proposed recovery bar. Nonetheless, even assuming that section 9613(k)(2)(D) does not by its own terms preclude a failure to notify defense, BN has failed to provide adequate statutory or logical support for its proposal that the Court apply standards other than the NCP, an approach that numerous other courts have rejected. *See, e.g., United States v. American Cyanamid,* 786 F.Supp. 152, 161 (D.R.I.1992); *New York v. General Electric Co.,* 592 F.Supp. 291, 302 (N.D.N.Y.1984); *United States v. Reilly Tar & Chem. Corp.,* 546 F.Supp. 1100, 1118 (D.Minn.1982); *see also United States v. Hardage,* 982 F.2d 1436, 1441 (10th Cir.1992), *cert. denied,* 510 U.S. 913, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993) (CERCLA is a strict liability scheme); 42 U.S.C. §§ 9607(b) (enumerating explicit, limited defenses).

Finally, prior to BN's joinder, this litigation, and, indeed, all matters concerning Site clean-up were vigorously and throughly contested by the BIC defendants. In addition, the failure of the United States and BN to

reach a settlement despite four years of opportunities in this litigation undermines BN's wistful argument that, with more timely notification, it might have reached an early settlement with EPA. In short, the Court is not convinced that this matter would have progressed any differently had BN received notification concurrently with the other PRPs. For all of these reasons, the United States' late notification' of BN was not .an action inconsistent with the NCP or otherwise a defense to recovery, and the United States and Colorado may recover response costs incurred prior to March 31, 1992.

## C. Decisions Associated With Interim Remedies

EPA's first Record Of Decision (ROD 1), issued on June 30, 1986, recorded the agency's choice of interim remedies designed to control the major sources of contamination and direct contact exposure. (Environmental Protection Agency, *Superfund Record Of Decision: Broderick Wood Products, CO.*, June 30, 1996, at i.) (ROD 1) ROD 1 selected several remedial activities, including excavation and on-site incineration of the sludge and oil contained in two impoundments, with off-site disposal of the residual ash. (*Id.*, at abstract.) EPA termed this interim remedy Operable Unit 1 (OU1).

In September of 1988, the EPA published an Amendment to ROD 1 (Amended ROD) which selected a different remedy for the sludges. "Based on new technical data and cost information obtained subsequent to the June 1988 ROD," the document explains, "EPA has reconsidered its decision to employ on-site incineration." (Environmental Protection Agency, *Amendment To June 1988 Record Of Decision Broderick Wood Products,* Sept. 1988, at 1.) (Amended ROD) Instead, the agency chose to utilize "off-site reclamation of the useful components of the sludge, and incineration and disposal of the residues." (*Id.*, at 2.)

BN challenges two actions taken in connection with OU1: EPA's decision to hire 7–7, Inc. to perform the on-site component of the sludge reclamation process and the shipment to Alabama and alleged incineration of 303 boxes of rocks that were removed from the

sludge. **At this time, the Court reserves ruling on the issue of removal from the Site and incineration of solids during OU1.**

### *Utilization of 7–7, Inc.*

■ The implementation contract for OU1 awarded a portion of the on-site work to 7–7, Inc. Using its patented technology, 7–7, Inc. excavated the sludges from temporary holding cells, hauled them to an on-site mixing tank, and combined the sludges with a solvent to make the mixture pumpable. BN argues that the initial decision to use 7–7, Inc. was not in conformance with the remedy set forth in ROD 1 and the Amended ROD, and, accordingly, increased costs of $201,094, which BN claims are attributable to the use of 7–7, Inc., should be disallowed.

As provided by the 1990 NCP, design and implementation of remedial actions "shall be in conformance with the remedy selected and set forth in the ROD or other decision document . for that site." 40 C.F.R. § 300.435(b)(1). Accordingly, if a remedial action did not correspond to the ROD, it fails to conform to the NCP, and the associated costs are not recoverable. *See* 42 U.S.C. § 9607(a).

■ After careful examination of the relevant law and facts, however, it appears to the Court that the decision to utilize 7–7, Inc. was not contrary to OU1. BN has not pointed to any evidence that 7–7, Inc. did not perform the sludge removal, preparation, and packaging work specified in the Amended ROD. At most, the choice of subcontractors resulted in increased costs, albeit costs commensurate with the selected remedy. Because even unreasonable or excessive costs should not be disallowed so long as the agency's decision conformed to the NCP, BN may be charged for the costs attributable to the decision to employ 7–7, Inc. *See, e.g., United States v. Hardage,* 982 F.2d 1436, 1443 (10th Cir.1992), *cert. denied,* 510 U.S. 913, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993) (§ 9607(a) "does not limit the government's recovery to 'all reasonable costs'") (italics omitted); *United States v. Northeastern Pharmaceutical & Chemical Co., Inc.,* 810 F.2d 726, 747–48 (8th Cir.1986), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987)

("CERCLA does not refer to 'all reasonable costs" but simply to 'all costs'") (italics omitted).

### D. Decisions Associated With Final Remedies

Operable Unit 2 (OU2) was the final remedy and included remediation of the conditions EPA characterized as the Site's principal threats. EPA recorded its selection of a remedy for OU2 in a ROD published in March, 1992 (ROD 2). BN seeks disallowance of costs associated with two aspects of OU2: remediation of groundwater contamination and cleanup to an allegedly over-protective cancer-risk level.

#### 1. Remediation of ground water contamination

According to studies cited in the ROD for OU2, by 1992, contamination in the surficial aquifer had migrated at least 500 feet north of the Site. (*See* Environmental Protection Agency, *Superfund Record of Decision: Broderick Wood Products, CO,* Mar. 24, 1992, app. C at 9.) (ROD 2) ROD 2 also indicated that although private wells exist in the area to which contamination had spread, none were used for domestic purposes at that time, and all homes and businesses in the area were served by independent municipal water supplies. (*See id.,* app. C at 11.)

After analyzing four alternative treatments for the surficial aquifer, ROD 2 selected a two-phase process involving both ex-situ and in-situ elements. (*See id.,* abstract at 2.) In addition, it called for 30 years of monitoring and institutional controls to limit access to the contaminated aquifer. (*See id.*)

In February, 1995, EPA published an Explanation Of Significant Differences (ESD) that set forth a significantly altered remedy for the surficial aquifer. (*See* Environmental Protection Agency, *Explanation Of Significant Differences for the Ground–Water Remedy,* Feb. 1995.) (ESD) The ESD indicated that information developed through additional studies and preliminary implementation of the OU2 remedy had revealed, *inter alia,* that natural biodegradation was a sufficient remedy for the plume to the north of the Site, and no technology would be capable of achieving the target remediation levels within a reasonable amount of time. (*See id.,* at 9). Accordingly, the ESD established new contamination reduction goals and required their attainment at specific points in the aquifer rather than throughout the plume of contamination. (*See id.,* at 7.) The ESD also called for construction of a wall to limit the spread of contamination off-site. (*See id.*)

■ BN raises two criticisms. First, BN asserts that the additional studies that catalyzed the ESD were not authorized by ROD 2 and therefore constituted a remedial design/remedial action activity inconsistent with the NCP. *See* 40 C.F.R. § 300.435(b). Second, BN argues that EPA was arbitrary and capricious in requiring additional studies to accept conclusions concerning groundwater remediation that, according to BN, both the BIC defendants and BN had urged for some time.

BN's first point lacks merit. As indicated by the United States, section 300.435(b) does not prohibit conducting additional studies. *See* 40 C.F.R. § 300.435(b). In fact, by authorizing the agency to prepare an ESD when there are differences that "significantly change but do not fundamentally alter the remedy selected in the ROD with respect to scope, performance, or cost," the NCP contemplates that a remedy may be altered on the basis of additional information. 40 C.F.R. § 300.435(c)(2)(i). By contrast, punishing EPA for refining its remedy, a course BN implicitly advocates, would create a reverse incentive to ignore new information.

■ BN's second point is equally unpersuasive. BIC's comments on ROD 2 did not anticipate all, or even many, of changes set forth in the ESD. (*See* Shephard, John P. & Frank P. Preger, *Comments of Broderick Investment Company On Proposed Plan for Broderick Wood Products Site Final Remedy (Operable Unit 2),* Nov. 22, 1991, at 18–41.) Moreover, although BN's correspondence to EPA memorialize BN view that the additional studies did not provide "new" information (*see, e.g.,* Letter from David C. Seep to Armando Saenz of Oct. 12, 1994, at 2 ("The 'new' data was not necessary to reach the conclusion that the remediation goals list-

ed in the ROD for on-site shallow groundwater could not be met")), BN has failed to indicate by whom and when, prior to the publication of ROD 2, EPA was made aware of the information that led to the ESD. Accordingly, because BN has failed to satisfy its burden of proof, the United States and Colorado may recoup costs incurred in connection with the additional studies and preparation of the ESD.

### 2. Cancer risk

In conducting risk management and remedial design and selection for OU2, EPA utilized a baseline target for the maximum acceptable cancer risk at the Site following all clean-up activities. Prior to selecting a remedy, EPA is required to establish remediation goals that "are protective of human health and the environment." 40 C.F.R. § 300.430(e)(2)(i). The NCP directs EPA to consider several factors; for cancer risk, the NCP specifically indicates:

> For known or suspected carcinogens, acceptable exposure levels are generally concentration levels that represent an excess upper bound lifetime cancer risk to an individual of between $10^{-4}$ and $10^{-6}$ using information on the relationship between dose and response. The $10^{-6}$ risk level shall be used as the point of departure for determining remediation goals....

Id. § 300.430(e)(2)(i)(A)(2).

■ Over strong objection from both BIC and BN, EPA mandated a cancer risk level of $10^{-5}$, or one case attributable to Site contaminants for every 100,000 persons subjected to continual exposure over a 70–year lifetime. The PRPs had encouraged EPA to adopt a less-protective standard of $10^{-4}$, or one increased case for every 10,000 continually-exposed persons. BN claims that EPA's cancer risk target was based on erroneous assumptions about current Site conditions and likely future uses, and that the $10^{-4}$ level would be sufficiently solicitous of human health and far more cost effective than man-

dating the more stringent clean-up. Thus, argues BN, EPA acted arbitrarily and capriciously in requiring clean-up to a $10^{-5}$ risk factor.[2]

■ As an initial matter, it appears there were shortcomings in EPA's analysis of existing Site conditions. As EPA admits, its risk calculations assumed continuing exposure to on-Site sludges. (See Combined Reply In Supp. Of United States' Mot. For Partial Summ.J. at 76, United States v. Broderick Investment Co., No. 86–369 (D.Colo. Sept. 27, 1996); Shephard & Preger, at 8.) Yet, as was pointed out to EPA prior to the selection of the OU2 remedy, the OU1 objective was removal of those sludges. (See id.; see also Am. ROD, Declaration Statement at 2.) Moreover, a Site assessment following OU1 indicated that approximately 98% of the sludges were removed. (See Remediation Technologies, Inc., Removal and Storage of Main And Secondary Impoundment Sludges, Dec. 18, 1990.)

EPA's response is two-fold. First, EPA argues that when it prepared the OU2 risk assessment, it was impossible to ascertain the sludge concentration that would remain following OU1 because the interim remedies had not yet been completed. At oral argument, the agency presented the additional argument that the remaining traces of sludge were so toxic that removal of 98% of their volume would not appreciably reduce overall carcinogenicity. In essence, EPA insists that because of these difficulties, its decision to adopt a standard more protective of human health should not be questioned.

Certainly, the mission of EPA is to protect human health and the environment. Nonetheless, that mission may not be advanced without consideration of any other policies. See 40 C.F.R. §§ 300.430(e)(2)(i)(A)(3), (4), and (5) (directing EPA to consider technical limitations, uncertainty, and "other pertinent information" in setting remediation goals).

---

2. BN also argued that EPA's risk assessment was flawed because it considered both pentachlorophenol (PCP), which contains dioxins, and non-PCP related dioxins. The Court is satisfied, however, that the issue of whether PCP causes cancer independent of residual dioxin contamination is a matter of reasonable scientific disagreement, and, accordingly, this portion of EPA's risk assessment was not arbitrary and capricious. See Holy Cross Wilderness Fund v. Madigan, 960 F.2d 1515, 1524 (10th Cir.1992).

Even accepting EPA's argument that ascertaining the post-OU1 cancer risk was practically impossible, it was nonetheless arbitrary and capricious for EPA to assume that cancer risk would remain unchanged following its multi-million dollar sludge removal operation.

■ BN also points out a second problem in EPA's risk assessment. Although ROD 2 states that "EPA's proposed plan assumed an industrial future use scenario for the site," (*see* ROD 2, app. C, at 24), EPA also incorporated an on-site residential scenario into its evaluation of remedial options. (*See* ROD 2, at 16.) EPA justified this unlikely premise by pointing to the redevelopment of two Denver-area rail yards, more particularly the Coors Field area which includes commercial and residential uses. "Therefore," EPA wrote, "it is not beyond the realm of possibility to assume a similar future for the . . . rail yard southwest of the Broderick site. Changing sequential uses for industrial and railroad properties are common in developing urban areas, even if the current uses have lasted for 75 to 100 years." (ROD 2, app. C, at 25.)

This last sentence, however, exposes the shortcoming in EPA's analysis. The Site has a long history as an industrial location, and is surrounded by other industrial yards, some of which are also seriously contaminated and subject to environmental clean-up. Certainly, it is possible that in the future, some redevelopment of the land around the Site might occur. Nonetheless, on the basis of the agency's own documents, EPA decision-makers were, or should have been, aware that "the residential population within the area seems to be declining" and that in fact "half of the census tracts within a two-mile radius of the [Site] actually lost population between 1980 and 1985." (*See* 1 *Endangerment Assessment Report,* Sept. 1990, at 4–1.) Accordingly, the Court is satisfied that it was arbitrary and capricious for EPA to mandate clean-up activities on the basis of possible, but highly improbable, land-use scenarios.

■ Finally, even leaving aside these two problems, it is apparent that EPA's risk assessment was statistically flawed. Dr. Glen Milner, BN's expert toxicologist, testified that a $10^{-5}$ risk factor is appropriate for a population of 100,000 subjected to continuous exposure over a 70–year period. If fewer than 100,000 persons are exposed, the one additional incident of cancer prevented by utilizing a $10^{-5}$ risk factor will never be realized, and a $10^{-4}$ factor is appropriate. Because of the improbability that 100,000 persons might live or work in close proximity to the Site, the Court is satisfied that it was arbitrary and capricious for EPA to utilize a risk factor of $10^{-5}$.

## III. ALLOCATION OF BIC SETTLEMENT CREDITS

■ After the Court's August 26, 1994, ruling that harm associated with the Site was divisible, the United States entered into a settlement agreement with the BIC defendants that was approved by the Court. *See United States v. Broderick Investment Co.,* No. 86–369 (D.Colo. June 26, 1995) (order approving consent decree between the United States, Colorado, and BIC defendants).[3] Pursuant to that agreement, the BIC defendants contributed $10.7 million in past response costs. *See id.* The agreement, however, made no provision for allocation between the western portion of the Site for which the BIC defendants and BN are jointly and severally liable and the eastern portion for which the BIC defendants alone bear responsibility. Consequently, BN and the United States dispute whether, and in what amount, any contribution required of BN should be reduced by the BIC defendants' previous contribution.

In the Superfund Amendments And Reauthorization Act of 1986, Congress provided:

A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the

---

**3.** Initially, BN objected to the Consent Decree, and its execution was held in abeyance pending evaluation of BN's comments. BN later withdrew its objections. *See United States v. Broderick Investment Co.,* No. 86–369, 1995 WL 918359 (D.Colo. Nov. 8, 1995) (approving BN's with-

settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the other by the amount of the settlement.

42 U.S.C. § 9613(f)(2).

■ In the more common CERCLA case in which harm is not divisible, a non-settling defendant's liability, as determined at trial, is reduced by the dollar amount of prior settlements. *See, e.g., O'Neil v. Picillo,* 682 F.Supp. 706, 730 (D.R.I.1988), *aff'd,* 883 F.2d 176 (1st Cir., 1989), *cert. denied,* 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990) (total liability for past response costs reduced by amount received in cash settlement). Here, however, the Court's prior divisibility ruling results in the novel situation that the harm for which the settling and non-settling defendants are liable is not co-extensive. By its terms, the statute provides no guidance in this situation. Moreover, the parties agree that no previous case has addressed this issue and the Court has not uncovered any precedential guidance.

BN proposes that it should receive full credit for the BIC settlement and points to three decisions by the courts of appeals. *See Hess Oil Virgin Islands Corp. v. UOP, Inc.,* 861 F.2d 1197 (10th Cir.1988); *Gulfstream III Assocs. v. Gulfstream Aerospace Corp.,* 995 F.2d 425 (3d Cir.1993); *Singer v. Olympia Brewing Co.,* 878 F.2d 596 (2d Cir. 1989), *cert, denied,* 493 U.S. 1024, 110 S.Ct. 729, 107 L.Ed.2d 748 (1990). None of these cases, however, arises in the context of a statutory scheme that imposes strict liability and contemplates disproportionate liability for non-settling parties. *See B.F. Goodrich v. Betkoski,* 99 F.3d 505, 527 (2d Cir.1996). Moreover, adopting this analysis would not encourage settlement, a federal policy that is especially important in the CERCLA context. *See id.* Accordingly, the Court concludes that these cases do not present sufficiently analogous situations to provide meaningful guidance.

The United States, on the other hand, argues that the BIC payments should be applied against all Site response costs, and that BN's liability should be reduced only to the extent that the previous payments and full satisfaction of a judgment against BN would result in double recovery by the United States. The United States' argument, however, fails to give full effect to the Court's divisibility ruling. In that Order, the Court held that BN was not responsible for contamination on the eastern portion of the Site. Lumping together response costs and credits for both portions under the United States' proposed method probably would require BN to shoulder responsibility for some costs incurred in connection with the eastern portion. Such an unfair result is analogous to requiring a neighboring landowner to contribute merely because of geographic proximity, and should not be encouraged.

Accordingly, both parties' proposed methods of allocation must be rejected, and yet a third formula developed that serves all of the competing policies. After careful consideration, it appears that the most appropriate manner of crediting the previous settlement is to determine the percentage of total response costs attributable to the western and eastern portions, and to allocate the BIC defendants' payments in accordance with those percentages.[4] Under this formula, BN may still bear a disproportionate share of liability, and thus the policies of strict liability and promoting early settlement will be encouraged. At the same time, however, because BN's potentially disproportionate liability will be connected only with that portion of the Site for which it bears responsibility, BN will not be forced to cover costs with which it has no connection. Finally, under the Court's formula, the United States, and not BN, will be required to bear the greater part of risk that the United States might have accepted an insufficient settlement.

The Court is confident that the parties can reach a stipulation concerning the percentage of overall costs attributable to the western portion, and will enter an Order specifying the dollar amount of credits to be applied

drawal of its objections and lifting stay on consent decree).

4. Thus, assuming that response costs attributable to the western portion constitute 50% of overall Site response costs, BN's liability would be reduced by 50% of the $10.7 payment made by the BIC defendants, or $5,350,000.

against BN's liability when this stipulation is provided. In view of the foregoing, it is

ORDERED that BN is liable for all response costs incurred in connection with remediation of the Broderick Wood Products Company site except for the following costs which are disallowed: increased costs attributable to EPA's utilization of a $10^{-5}$ cancer risk factor rather than a $10^{-4}$ factor. It is

**FURTHER ORDERED that the Court reserves ruling on the issue of removal from the Site and incineration of solids during OU1.** It is

FURTHER ORDERED that damages recoverable from BN shall be reduced by that portion of the BIC defendants' settlement payment that is attributable to the portion of the Site for which BN and the BIC defendants are jointly and severally liable, utilizing the formula discussed above.