**UNITED STATES of America, Plaintiff,**

**and**

**State of Colorado, Intervenor,**

**v.**

**BRODERICK INVESTMENT COMPANY, Tom Connolly as Trustee, and Burlington Northern Railroad Company, Defendants.**

**Civil Action No. 86–Z–369.**

United States District Court,
D. Colorado.

May 15, 1997.

Stephen Taylor, Assistant U.S. Attorney, Denver, CO, Jerel L. Ellington, Environment & Natural Resources Div., Environmental Enforcement Section, Denver, CO, Richard L. Sisk, Office of Regional Counsel, U.S. Environmental Protection Agency, Region VIII, Denver, CO, for plaintiff.

Robert Eber, Attorney General's Office, Natural Resources Section, Denver, CO, for intervenor.

Gary E. Parish, Robert J. Potrykus, Jr., LeBoeuf, Lamb, Greene & MacRaie, L.L.P., Denver, CO, for defendant Burlington.

## MEMORANDUM OPINION AND ORDER

WEINSHIENK, District Judge.

The matter before the Court concerns the liability of Burlington Northern Railroad Company (BN) to the United States and the State of Colorado for clean-up costs associated with the Broderick Wood Products Site (Site) located near Denver, Colorado. In an Opinion filed February 25, 1997, the Court determined that BN was liable for a portion of the response costs incurred by plaintiffs pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), excepting certain costs the Court found to have been arbitrarily and capriciously incurred. At that time, the Court reserved ruling on one class of response costs, those incurred in connection with the removal from the Site and incineration of solids during the interim remedial phase. On March 25, 1997, the Court heard additional argument on this issue, supplementing two days of argument on overall liability issues presented on November 18 and 19, 1996.[1]

---

1. Although on March 25, 1997, the parties technically were before the Court on plaintiffs' motion for reconsideration, argument was limited to the single issue on which the Court had reserved ruling. At that hearing, the Court observed that both sides presented arguments and facts that had not been raised previously. In effect, the March hearing was a continuation of the November hearing with regard to the remaining liability issue.

Throughout the clean-up process, the United States Environmental Protection Agency (EPA) served as the government's primary representative. EPA's first Record Of Decision (ROD 1), issued on June 30, 1986, recorded the agency's choice of an interim remedy designed to control the major sources of contamination and direct contact exposure. (Environmental Protection Agency, *Superfund Record Of Decision: Broderick Wood Products, CO.,* June 30, 1988, at i.) ROD 1 selected several remedial activities, including excavation and on-site incineration of the sludge and oil contained in two impoundments, with off-site disposal of the residual ash. (*Id.,* at abstract.) EPA termed this interim remedy Operable Unit 1 (OU1).

In September of 1988, the EPA published an Amendment to ROD 1 (Amended ROD) which substituted a different remedy for the sludges. "Based on new technical data and cost information obtained subsequent to the June 1988 ROD," the document explains, "EPA has reconsidered its decision to employ on-site incineration." (EPA, *Amendment To June 1988 Record Of Decision Broderick Wood Products,* Sept. 1988, at 1.) Instead, the agency chose to utilize "off-site reclamation of the useful components of the sludge, and incineration and disposal of the residues." (*Id.,* at 2.)

As described in the Amended ROD, the selected remedy called for both solid and liquid sludges to be excavated, mixed with a solvent, and pumped into rail tank cars for shipment to a permitted recycler. At the off-site facility, the sludge mixture would be recycled by a process of filter pressing, dehydration, distillation and combination with other chemicals. Residue from the recycling process was to be incinerated, with residual ash buried in a licensed landfill. The temporary impoundment cell liner, which initial projections estimated would fill three boxes, was also to be shipped off-site and incinerated.

During implementation, however, problems arose with EPA's selected remedy. In particular, the feasibility studies conducted prior to selecting the OU1 remedy anticipated that solid material would comprise only 15 percent of the total sludge volume. (*See* Ex. 2.

to Pls.' Reply, at 2, 3 (Feb. 3, 1997); Omaha Dist. Reply To EPA Region VII Gen. Technical Issues Of Concern, at 1 (Ex. 3 to Pls.'s Addendum (Jan. 3, 1997) (hereinafter Omaha Dist. Reply).)) As Allied Signal, the contractor selected to carry out the OU1 remedy, began processing the sludges, it discovered that the solid concentration was significantly higher. Ultimately, it appears that the solid concentration was actually close to 51 percent. (*Id.,* at 1, 5.)

Due to this significantly higher volume of solids, Allied Signal and its subcontractors took three remedial actions that were not anticipated in ROD 1 or Allied Signal's contract. First, because the pumping equipment used to transfer the sludges to the railcars repeatedly clogged due to the high solid concentration, the contractors installed a settling box. Second, after the sludge-filled railcars arrived at the Alabama recycling site, Allied Signal discovered that additional solids had settled in the bottom of the cars, and that this material could not be made pumpable again. Accordingly, these tar heels were removed from the cars by hand and incinerated in Alabama.

The third unanticipated action was the incineration of far more miscellaneous material than was planned for in the Amended ROD. The OU1 remedy required incineration of the plastic liner that had contained the sludges in the impoundment ponds, and Allied Signal's contract included packaging the liner in 20 one-cubic-yard boxes, shipment to Alabama, and incineration. Because of the unexpectedly high solid content, however, a total of 396 boxes were shipped, and their contents incinerated. (Ex. 2 to Pls.' Reply, at 11 (Feb. 3, 1997); Basis Of Government Settlement Offer (Ex. 2 to Pls.' Addendum (Jan. 3, 1997).)) In addition to the plastic liner, these boxes contained muck that had adhered to the liner; the impoundment covers; and material scraped from the impoundment walls and floor after the liner had been removed. (*See* Ex. A to Pls.' Mot. Partial Reconsideration (Dec. 18, 1996).) Taken together, these three addition actions resulted in an Allied Signal bill that exceeded the original contract by approximately $1.3 million.

Section 107(a) of CERCLA provides, "Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section," a potentially responsible party such as BN "shall be liable for ... all costs of removal or remedial action incurred by the United States government ... not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a). Accordingly, BN bears the burden of showing that the actions of United States, acting through the EPA, were inconsistent with the national contingency plan (NCP).[2] *U.S. v. Hardage,* 982 F.2d 1436, 1442 (10th Cir.1992), *cert. denied,* 510 U.S. 913, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993). To meet this burden, BN must show that "the EPA acted arbitrarily and capriciously in choosing a particular response action to respond to a hazardous waste site." *Id.; see also* 42 U.S.C. § 9613(j)(3).

**1. Characterization of Site Conditions**

■ As an initial matter, BN asserts that EPA arbitrarily and capriciously failed to characterize adequately Site conditions prior to selecting a remedy. BN is correct that the NCP requires EPA to study site conditions carefully prior initiating any action. EPA must "collect data necessary to adequately characterize the site for the purpose of developing and evaluating effective remedial alternatives." 40 C.F.R. § 300.430(d)(1). In part, this compels EPA to

characterize the nature of and threat posed by the hazardous substances and hazardous materials and gather data necessary ... to support the analysis and design of potential response actions by conducting, as appropriate, field investigations to asses the following factors: ...

(iii) The general characteristics of the waste, including quantities, state, concen-

tration, toxicity, propensity to bioaccumulate, persistence, and mobility; ...

*Id.* § 300.430(d)(2).

Although BN has made a strong argument, the administrative record supports EPA's contention that its characterization was legally sufficient. Admittedly, the administrative record provides some support for BN's theory that proper sampling was not conducted because of EPA's insistence on an expedited clean-up schedule. (*See id.,* at 1). Nonetheless, numerous documents in the record indicate that obtaining an accurate measure of solid concentration would have been prohibitively expensive and time consuming, if not practically impossible. (*See, e.g.,* Letter from Robert L. Duprey, Dir., Hazardous Waste Mgmt. Div., to Howard Roitman, Acting Dir., Hazardous Materials and Waste Mgmt. Div., at 5 (Ex. 4 to Pls.' Addendum, Jan. 3, 1997); Omaha Dist. Reply, at 1–2.) Moreover, mandating every imaginable study prior to remedy selection would hopelessly delay EPA's important activities, and the benefit of such an exacting requirement is unclear. Accordingly, the Court is satisfied that EPA's failure to conduct additional suitability studies was not a violation of the NCP.

**2. Reconsideration Of Chosen Remedy In View Of Changed Conditions**

■ BN's second objection is that EPA failed to reconsider its selected remedy when the extent and impact of the changed conditions became obvious. Although not all unanticipated conditions mandate critical reexamination of prior decisions, the NCP requires re-evaluation of a selected remedy if changed conditions fundamentally alter that remedy with respect to scope, performance, or cost. *See* 40 C.F.R. § 300.435(c)(2).[3]

The Amended ROD clearly did not contemplate the problems the high solid concen-

2. Two different NCPs were in force during the Site remedial activities: the 1985 NCP, which applies to the first Record of Decision for the Site, and the 1990 NCP, which applies to all other activities. Unless otherwise noted, citations refer to the 1990 NCP.

3. Section 300.435(c)(2) states, "[I]f the remedial action ... differs significantly from the remedy

selected in the ROD with respect to scope, performance, or cost, the lead agency ... shall either ... [p]ublish an explanation of significant differences ... or ... [p]ropose an amendment to the ROD if the differences ... fundamentally alter the basic features of the selected remedy with respect to scope, performance, or cost."

tration would pose, as the document was premised on the overly-optimistic estimate of 15 percent. Apparently accepting this shortcoming, EPA argues that each of the three responses to the higher solid concentration resulted from an independent changed condition and, considered separately, each was an insignificant deviation within EPA's discretion. This argument, however, is not persuasive. The changed *conditions* were not the installation of a settling box or incineration of the contents of 276 additional boxes. Rather, these were three separate *responses* to a single changed condition: actual solid concentration of more than three times the original estimate. EPA's own documents indicate that at the time the operative events occurred, the agency shared this view. (*See, e.g.,* Omaha Dist. Reply at 5 ("The changed site condition comes from the fact that the actual solids content was 51% not 15%"); Broderick Wood Key Points (Ex. 2 to Pls.' Reply, Feb. 3, 1997).)

Thus, as a result of the single changed condition, it appears that in fact the remedy was altered fundamentally with respect to scope and cost. The $1.3 million price tag for Allied Signal's additional actions represented a 61 percent increase from the original $2.2 million estimate for *all* OU1 remediation.[4] Confronted with such a significant deviation from the selected remedy, a critical examination of the action plan was required. *Cf. Wash. State Dept. of Transp. v. Natural Gas Co.,* 59 F.3d 793, 804 (9th Cir.1995) (agency should have reassessed alternatives when it became clear initial plan underestimated the amount of hazardous material by 160%).

■ Finally, EPA argues that the additional $1.3 million should be recoverable because BN has failed to demonstrate that the agency's failure to reconsider the selected remedy was not harmless error. Yet on the basis of the record before the Court, such a conclusion is not warranted. For example, EPA asserts that once the tar heels were discovered, incineration in Alabama was the only alternative because federal environmen-

tal regulations prohibited returning the solids to the Site. EPA has failed, however, to rebut the suggestion that it could have received a waiver of these regulations similar to waivers that were obtained in connection with subsequent remedial activities. As EPA's own documents indicate that returning the solids to the Site for remediation during the next phase would have resulted in savings of between $385,165 and $890,787 (*see* ex. 2 to Pls.' Reply, at 12), such alternatives should have been considered.

EPA acted arbitrarily and capriciously by failing to follow the proper procedures. Allowing the agency to recover all of its additional costs, either with or without the benefit of a factually questionable argument concerning harmless error, would provide no incentive to EPA to play by the rules in the future. By failing to consider the effect of the over 200 percent increase in solid concentration, EPA effectively abdicated its statutorily-mandated planning role and delegated to its contractors authority to instigate indiscriminate remedial measures. This course of conduct not only excluded the public and potentially responsible parties such as BN from the decision-making process, but also precluded EPA from selecting the remedy, as the NCP requires. *See* 40 C.F.R. § 300.430(f)(ii) ("The lead agency ... makes the final remedy selection decision, which shall be documented in the ROD."). For these reasons, additional costs associated with increased solids will be disallowed as the result of arbitrary and capricious action not in conformance with the NCP. In view of the foregoing, it is

ORDERED that BN's liability for response costs incurred in connection with remediation of the Broderick Wood Products Company site shall not include the approximately $1.3 million in additional expenses incurred because of the unanticipated solids.

4. It appears that the final cost of OU1 remediation, including the additional $1.3 million and other cost overruns, was $4.5 million.